UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| TONY SALVATORE, | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-cv-00660 SRC |
| | ) | |
| CITY OF WILDWOOD, MISSOURI, | ) | |
| et al., | ) | |
| | ) | |
| Defendant(s). | ) | |

**<u>MEMORANDUM AND ORDER</u>**

This case implicates a fundamental tenet of democracy, the integrity of local elections. While running for Wildwood city council, Tony Salvatore attempted to stand on city street corners holding a sign asking citizens to vote for him.  A Wildwood ordinance prohibits the use of signs on any public property or public right of way.  After being told multiple times by the police, at the request of city officials, to stop, Salvatore filed this lawsuit challenging the constitutionality of the ordinance under the First Amendment.  Both Salvatore and various Defendants now move for summary judgment [47], [50].  The Court denies both motions and sets the case for trial.

**I.    BACKGROUND**

Salvatore brings this action pursuant to 42 U.S.C. § 1983 claiming that Wildwood, Mayor James Bowlin, then-incumbent City Councilman Raymond Manton, and then City Manager Ryan Thomas violated his free-speech rights under the First Amendment when they prevented him from holding his campaign sign on street corners.  Salvatore alleges two counts: (1) Violation of the First Amendment under 42 U.S.C. § 1983 against Wildwood and Bowlin, Manton and Thomas in their individual capacities, and (2) Conspiracy against Bowlin, Manton,

1

and Thomas.  Manton passed away after the filing of this lawsuit.  In March 2020, the parties

stipulated to dismissing Manton from this lawsuit due to his death.  Doc. 40.

Relevant to determination of the parties' Motions for Summary Judgment is the issue of

sanctions raised by Salvatore.  At the close of discovery, Salvatore filed a motion for sanctions

alleging that Defendants intentionally destroyed or failed to preserve evidence, specifically text

messages from the phones of both Bowlin and Thomas.  In denying Salvatore's motion without

prejudice, the Court left open the possibility of imposing sanctions if Salvatore presents evidence

at trial establishing: 1) when the duties of Bowlin and Thomas to preserve evidence arose, and 2)

prejudice from the lost information.

## II.       UNCONTROVERTED MATERIAL FACTS

### A.       The Ordinances

Wildwood had an ordinance regulating the use of signs.  The ordinance broadly defined

"sign" as "any identification, description, illustration or device; illuminated or non-illuminated,

which is visible to the general public and directs attention to a product, service, place, activity,

person, institution, business or solicitation, including any permanently installed or situated

merchandise; as an emblem, painting, flag, banner or placard designed to advertise, identify or

convey information."  Wildwood Code § 415.030.  Section 415.420(A)(1)(b)(8) prohibited living

signs – undefined but apparently signs held by or worn on humans – of any kind in commercial

and industrial areas.  Section 415.440(F) prohibited signs on "any public property or public right

of way except as permitted by the Director of Public Works."  The purpose of these ordinances,

along with all of Wildwood's zoning ordinances, was "to promote the health, safety, morals,

comfort, and general welfare; to secure economic and coordinated land use; to facilitate the

adequate provision of public improvements; to protect the natural environment of the community

2

and its unique assets of trees, watercourses and floodplains and topography; and to prevent or minimize damage to public and private property from erosion and other detrimental effects of development." Wildwood Code § 415.020. Wildwood has many rural roads, two lanes in width, with no shoulders or sidewalks. In April 2020, Wildwood repealed the living-sign and signs-on-public-property ordinances, i.e. § 415.420(A)(1)(b)(8) and § 415.440(F).

**B.    Wildwood's Contract with the St. Louis County Police**

Wildwood contracts for police services with the St. Louis County Police Department and did so in 2018. During the relevant times, Captain Timothy Tanner was the Chief of the St. Louis County Police Department – Wildwood Precinct. The St. Louis County Police Department's policies governed the day-to day operations of the Wildwood precinct, and city officials and employees did not otherwise direct the police. Bowlin, Thomas, Manton, and Wildwood's Director of Planning and Parks Joe Vujnich never directed Captain Tanner or any of his officers to take specific enforcement action against Salvatore. Bowlin, however, does have the power to veto a vote of the Wildwood council to renew the police contract. In February 2019, the St. Louis County Police Department agreed not to enforce the ordinances at issue until the resolution of this lawsuit.

**C.    Salvatore's Campaign Activities**

At the beginning of February 2018, Vujnich held a candidate orientation meeting with all candidates for political office. The purpose of the meeting was to provide the candidates with instructions and guidance regarding campaign rules, including the placement of signs. Salvatore attended, and received a document with information about sign restrictions. Salvatore remembers that Vujnich told attendees they could erect signs on private property and that if they placed signs on public property, they would first receive an email to remove them. If they did

not remove the signs, Wildwood would take them down and candidates would have 24 hours to collect them.  If the candidates did not collect the signs, Wildwood would throw them away. Vujnich did not address wearing or holding a sign and waving at people.

To promote his campaign for councilman, Salvatore stood on public sidewalks throughout various times of the day, including during rush hours, holding a campaign sign.  At the beginning of March 2018, incumbent city councilman Manton emailed City Administrator Thomas about Salvatore's activities.  Manton began the email, "Its (sic) come to my attention that my opponent Tony Salvatore has been practicing an illegal campaign tactic."  He further explained, "His tactic is to stand on the side of the road with six or so of his campaign signs, spaced about six feet apart, on either side of the road, with one of the signs in hand and waiving (sic) at bypassing traffic."  Manton then listed locations where Salvatore had been spotted. Manton wrote that what Salvatore was doing was "dangerous" and was "hurting" Manton's campaign.  Manton implored Thomas to "please let me know how you and the other municipalities plan to address this matter at your earliest convenience[.]"

The following day, Thomas texted Vujnich about Salvatore's activities and asked Vujnich to advise Salvatore that Wildwood prohibits the use of signs on public property. Vujnich is charged with interpreting and enforcing Wildwood's ordinances.  Vujnich believed Salvatore violated the public-right-of-way ordinance (§ 415.550(F)) by holding a sign in the public right-of-way.  A photo of Salvatore campaigning shows him wearing a campaign sign while standing next to a two-lane road without a shoulder.  Salvatore claims this photo was taken as a "photo opportunity" and he never actually stood close to the road while campaigning.

The same day he received the text from Thomas, Vujnich sent an email to what he thought was Salvatore's email address.  In the email, he stated the Department of Planning had

4

received a complaint about Salvatore's campaign signs and standing alongside the edge of a roadway and asked him to stop using living signs, placing signs on public property, and standing on the edge of the roadway.  In the email, Vujnich accidentally cited to the living-sign ordinance (§ 415.420(A)(1)(b)(8)) instead of § 415.440(F).  Because Vujnich sent the email to an old email address, Salvatore never received the email.  Even after receiving Salvatore's correct email address, Vujnich did not forward the email to Salvatore because Vujnich realized the living-sign ordinance did not apply to Salvatore.  Vujnich did not send another email to Salvatore because the St. Louis County Police were already responding to complaints about Salvatore's campaign activities.

Throughout the campaign, police officers of various municipalities approached Salvatore, with varying degrees of interaction.  While not in the parties' facts, the Court notes for purposes of context that Wildwood is nestled among other municipalities, including Chesterfield and Clarkson Valley.  And, presumably because their roads feed traffic into Wildwood, Salvatore conducted some of his campaign activities in these neighboring communities, whose police also approached Salvatore.  Fed. R. Evid. 201 (permitting a district court to take judicial notice of a fact not subject to reasonable dispute, whether or not requested by the parties.); *see also Boyce Motor Lines v. United States*, 342 U.S. 337, 344 (1952) (Jackson, J. dissenting) ("We may, of course, take judicial notice of geography.").

Salvatore's first incident with the police occurred on March 9, 2018.  The record of the call for service does not identify the caller, stating "Male standing in Wildhorse Parkway Dr. with political sign – just inside Chesterfield city limits."  Two officers responded and interacted with Salvatore but permitted Salvatore to stay where he was and continue campaigning.  About an hour later, another Wildwood police car came by but did not stop Salvatore.

5

Five days later, Salvatore was campaigning on Valley Road in Clarkson Valley, standing on the sidewalk.  Someone campaigning for Manton initially approached Salvatore and told him to stop what he was doing. Then later, as a Wildwood police officer observed, a Clarkson Valley police officer approached Salvatore and told him he could hold his campaign sign but could not wear it.  The next police interaction occurred on March 20th, when Salvatore was campaigning on Clayton Road and Quail Valley in Wildwood.  Toward the end of the afternoon, while Salvatore stood on a sidewalk and waved at cars, two police cars responding to a call about Salvatore pulled into the subdivision.  At that time, Salvatore was wrapping up his campaign activities for the day.  Once the officers realized this, they said, "You are ok, you are ok. We just, we are leaving."  The record of the call for service does not identify the caller for this incident.

A few days later, Salvatore was campaigning in the Wildhorse subdivision in Wildwood, handing out flyers door-to-door.  A police vehicle inexplicably parked behind Salvatore's vehicle, but Salvatore did not have any communication with the officer.  The next interaction occurred three days later, when Salvatore was campaigning at Clayton Road and Quail Valley in Wildwood.  Manton, the incumbent councilman, called the police and reported that Salvatore was wearing a sign and was "live streaming."  Responding to Manton's call, two officers reported to the scene and observed Salvatore standing on a sidewalk, wearing a sign, and waving at traffic.  Salvatore had also placed multiple signs in the grass nearby.

When the officers approached Salvatore, he told them he had a First Amendment right to do what he was doing.  One officer told him that he was in violation of a Wildwood ordinance because he was wearing a living sign in the public right-of-way.  The officer showed Salvatore a piece of paper that appeared to have the ordinance written on it, and told Salvatore that both the police and Wildwood had already informed Salvatore this activity violated the ordinance.

Salvatore then removed the living sign, and the officers permitted him to remain on the sidewalk and wave at traffic.  The officer told Salvatore multiple times that he could stand on private property with the permission of the owner.  Salvatore asked the officer to issue him a citation, but the officer instead referred the matter to the Prosecuting Attorney's Office.  Wildwood's records state "Anthony Salvatore was in violation of City of Wildwood ordinance for 'living sign' warrant app conducted."  The Wildwood prosecutor refused to charge Salvatore.

Within the next week, Salvatore campaigned on private property on Strecker Road near Kehrs Mill in Wildwood.  Salvatore stood in the side yard of private property with the permission of the owner.  The police call record shows that a call complaining about Salvatore came from Wildwood City Hall.  A Wildwood police officer approached Salvatore from across the road and asked if Salvatore had permission from the owner to campaign in that location and to park his car on private property.  Frustrated by the number of police encounters, Salvatore told the officer to go ask the owner himself.  A Chesterfield police officer also responded and after conferring, both police officers left.  At some point, Salvatore supporter Jean Vedvig held a campaign sign for Salvatore while on a sidewalk.  Thomas emailed Vujnich, and others, to report that Vedvig was doing so.

After speaking with the ACLU, Salvatore continued to campaign on public property.  Salvatore's wife did not want him to leave the house to campaign because she feared the police would arrest him.  Salvatore also feared the police would arrest him.  Police investigated bullet holes found in one of Salvatore's campaign signs.

During all of their interactions with Salvatore, the police never issued a citation to Salvatore, but the facts reveal that his campaign was marred by these and other events.  Salvatore believes the purpose of these interactions was to intimidate him and to stop his campaign.  In

7

April 2018, Salvatore filed a "corruption complaint" with the State of Missouri, a Freedom of Information Act request, a complaint with the ACLU, and a charter complaint with Wildwood. Salvatore believes the misinterpretation of the ordinances was a "purposeful mistake" to derail his campaign and deny him his First Amendment rights.

In his 25 years with Wildwood, Vujnich is unaware if police stopped anyone besides Salvatore for holding a political sign on public property, and he has never seen someone referred to the prosecuting attorney for something like this. Thomas cannot think of any other candidate that has been referred to the prosecuting attorney based on campaign activities.

### D.    Campaign activities of other candidates

During the 2018 campaign season, five other candidates, including Manton, were also forced to move signs out of the public right-of-way. As early as February 8th, Wildwood received complaints about political signs being illegally placed in public rights-of-way by candidates. In late February, Thomas received reports about the placement of multiple political signs in the public rights-of-way within the Strecker Farms subdivision. He emailed code enforcement members Gramlich and Laughlin about the issue.

Throughout March, Vujnich, and other code enforcement officials, sent emails to seven different candidates about signs in the public-right-of-way. In mid-March, Gramlich sent an email to all of the candidates about placement of signs in the public right-of-way. He requested that the candidates remove the signs and place them on private property. He also directed the candidates to contact him if they had any questions.

### E.    Communications between Wildwood Officials

Throughout the campaign season, Thomas received a few different complaints from Manton about how Salvatore was allegedly breaking the law regarding signs. A few of

8

Thomas's texts do exist and one shows that when he received the first complaint from Manton, Thomas asked Vujnich to advise Salvatore that Wildwood had received a complaint and admonish Salvatore that he should not be using signs in this manner.  Thomas also asked city code enforcement, and ultimately the police, to investigate whether Salvatore violated the sign ordinance.  Thomas testified that he did not know if Salvatore's campaign activity actually violated an ordinance so he asked Vujnich to investigate.  Thomas does not know if any ordinance applies to standing on the side of the road holding a campaign sign.  A few weeks after Manton's initial complaint, Thomas contacted the City Attorney to get clarification about the ordinances.  In early March, Vujnich told Thomas, and Captain Tanner, that the living-sign ordinance only applied in commercial and industrial areas.

Manton approached Vujnich in person about Salvatore approximately a dozen times and called Thomas multiple times to complain about Salvatore's alleged ordinance violations during the campaign.  In response, Thomas engaged the police and sent them out to where Salvatore campaigned.  Thomas told Manton that Wildwood would investigate and notify Salvatore by email and that if Manton had a complaint about the breaking of a law, he should contact police directly and that Thomas did not need to be involved.  Meanwhile, Thomas told Salvatore that if the police receive a complaint, "they will always investigate."  Thomas never directed anyone else to contact the police as a result of Manton's complaints, but his understanding is that the police received other complaints about Salvatore's campaign activity.

Thomas communicated with Captain Tanner by phone and in person three or four times about Salvatore.  On the days Salvatore campaigned, and had interactions with the police, Bowlin, Thomas, and Captain Tanner had calls with each other, but what they discussed is not in

the record.  These individuals also texted with one another, but the contents are unknown because of the deletion of various text messages.

On March 25th, four minutes after speaking with Thomas, Captain Tanner called Bowlin. He does not remember what the call was about but does not believe it related to Salvatore. Captain Tanner does not remember a phone call with Thomas on the morning of March 28th or a second phone call with Thomas in the evening on that date, the same day two officers stopped Salvatore.  He also does not remember phone calls with Thomas in the morning and afternoon on March 30th, another day that two officers stopped Salvatore.  Thomas initiated each of these phone calls with Captain Tanner.

These are only two *known* exchanges between Bowlin and Thomas about Salvatore's campaign.  Thomas let Bowlin know that he forwarded Manton's initial email to Vujnich.  And, he told Bowlin that he believed Salvatore's behavior was unsafe.  Bowlin testified that he told Thomas to follow the protocol that would be followed for anyone else.  Bowlin also testified that he is unaware of any action Thomas took regarding Salvatore's campaign activity.

Bowlin states he never contacted law enforcement about Salvatore's campaign, never spoke with Captain Tanner about Salvatore, and never formed an opinion about whether Salvatore's activities violated the ordinance.  Captain Tanner testified that Bowlin never weighed in or tried to address the issue with him and Bowlin never tried to inject himself into the investigation of Salvatore.

Bowlin had a conversation with Manton about Salvatore's campaign activity when Manton called Bowlin to discuss Salvatore's campaign.  Bowlin never met with, spoke with, or texted Vujnich about Salvatore's campaign activity nor did Bowlin check with any attorney about the legality of Salvatore's campaign activities.  Bowlin did contact Chesterfield Mayor

Bob Nation to inform him of Salvatore's campaign activities and to see what Chesterfield's laws prohibited.

Captain Tanner testified he had one phone call with Manton about Salvatore.  Manton complained about Salvatore wearing a sign but did not complain about Salvatore waving at cars. During the call, Manton asked whether the police were taking enforcement action against Salvatore for violating the ordinance.  Captain Tanner responded that if the police department receives a call for service, it is mandated to respond and the police department would determine venue and if enforcement action is warranted.  Captain Tanner stated the responding officer determines the appropriate action to take when faced with an ordinance violation.  When he interacted with the police, Salvatore does not remember any police officer telling him they were responding to calls from Thomas, Bowlin, or Manton.

Captain Tanner spoke to several people about Salvatore's campaign activities, including Vujnich two or three times. When Captain Tanner spoke with his precinct supervisors, Salvatore's First Amendment rights never came up.

### F.     Missing Text Messages

Thomas regularly deleted text messages from his Wildwood-issued phone.  He knew that he needed to retain messages containing city business.  Thomas deleted text messages if they shared information but did not include a discussion of that information.  He deleted messages one at a time, as well as in bulk.  Thomas deleted text messages with Bowlin and Captain Tanner but says he only ever deleted text messages with these individuals one at a time, never in bulk. In addition to individual texts, Thomas also had group texts with Bowlin and Captain Tanner. Thomas claims none of his texts with either Bowlin or Captain Tanner were about Salvatore.

In August 2018, City Clerk Amanda Foster produced phone records, including texts, to Salvatore.  Foster stated there were no text messages found to or from Thomas's cell phone in August 2018, although she did produce a text message conversation between Thomas and Vujnich that occurred on March 2, 2018.

### G.     Other Activities

Salvatore points to other First Amendment activities that Wildwood allows, such as a church's annual right-to-life march in which demonstrators march in the middle of the street. The church usually alerts the police about the march, and sometimes requests a permit, but does not always do so.  Vujnich testified Wildwood does not stop unions picketing over the use of non-union labor.  Thomas, however, did not answer an email from Salvatore questioning if a union could picket in a right-of-way.  Wildwood does not have any written guidelines for conducting a protest in Wildwood.

Vujnich testified Salvatore could have gone to the Director of Public Works and requested authorization to campaign, but did not tell Salvatore he could have done this. Salvatore had previously served as a member of the Wildwood City Council from 2007-2009. When Salvatore campaigned in 2007, engaging in the same campaign activities he did in 2018, Vujnich did not say anything about it.

### H.     Mayor Bowlin

As mayor, Bowlin is the head of the elected branch of Wildwood's city government. Wildwood does not provide training about the First Amendment to its elected officials or employees and Bowlin does not have special training on the First Amendment, beyond his training as an attorney.  Former Councilmembers Tammy Shea and Kelley Woerther have observed Bowlin "using his political power to unfairly silence perceived political opponents."

12

For example, Thomas ran background checks on Woerther and Kelly for Bowlin.  Woerther

questioned Bowlin's background check policy at a committee meeting; Bowlin claims he had

justification for doing criminal background checks on certain people.

After Kevin Dillard made disparaging remarks about Bowlin, Bowlin had his attorney

send a cease and desist letter to Kevin Dillard's employer.  Dillard testified that Bowlin tried to

intimidate him from running for City Council.  Bowlin also attempted to have former Mayor Tim

Woerther prosecuted for destroying a draft of notes he wrote at a City Council meeting.  Bowlin

sent an email to Kelley Woerther complaining about her Facebook posts and he texted Thomas

about attempting to shut down social media commentary.  In April 2018, Bowlin proposed a

resolution to censure Shea for criticizing Thomas.  When Shea asked why a meeting Bowling

was having at a restaurant was private and not public, Bowlin threated to call the police.  Finally,

someone made an assertion that Bowlin inappropriately used the Wildwood logo for personal

use.

Salvatore offered other evidence about Bowlin's activities.  In October 2017, Bowlin

proposed a city charter amendment to change the power structure in Wildwood.  Bowlin

contributed approximately $1,000 to Progress for Wildwood, a political action committee.

Bowlin does not know if this PAC contributed money to Manton's campaign.  Manton and his

wife attended an event for Progress for Wildwood and participated in the PAC.  Salvatore did not

connect these facts to the issues in this case, and the Court simply notes them for the record.

## I.      Evidence at the Sanctions Hearing

In addition to the evidence presented by the parties, the Court heard evidence at the

hearing on Salvatore's Motion for Sanctions and the Court considers it here.  *See* Fed. R. Civ. P.

56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in

the record."); *see also* Memorandum and Order on the Motion for Sanctions and transcript from the hearing.  Docs. 93, 95.

## III.  STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In ruling on a motion for summary judgment, the Court is required to view the evidence in the light most favorable to the non-moving party and must give that party the benefit of all reasonable inferences to be drawn from the underlying facts. *AgriStor Leasing v. Farrow*, 826 F.2d 732, 734 (8th Cir. 1987).  The moving party bears the initial burden of showing both the absence of a genuine issue of material fact and entitlement to judgment as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); Fed. R. Civ. P. 56(c).

In response to the proponent's showing, the opponent's burden is to "come forward with 'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  Self-serving, conclusory statements without support are insufficient to defeat summary judgment.  *Armour and Co., Inc. v. Inver Grove Heights*, 2 F.3d 276, 279 (8th Cir. 1993).  Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## IV.  DISCUSSION

### A.      First Amendment Violation

Two ordinances are at issue in this case; the living-sign ordinance and the public-right-of-way ordinance.  Salvatore argues Defendants applied the living-sign ordinance against him.  The uncontroverted facts show that while Vujnich and Thomas initially believed the living-sign ordinance applied to Salvatore, they quickly realized he did not campaign in areas zoned for commercial or industrial use and they determined the appropriate ordinance at issue was the public-right-of-way ordinance.  Because Defendants did not apply the living-sign ordinance against Salvatore, the Court only analyzes whether the public-right-of-way ordinance and Defendants' actions in enforcing it violate the First Amendment.

### i.      Standing

The Court must first address two arguments related to Salvatore's standing.  First, Defendants argue that Salvatore did not suffer a constitutional injury because he did not incur any monetary damages, and law enforcement never arrested him, issued a citation, or threatened to use force against him.  In the First Amendment context, a plaintiff is not required to go through a criminal prosecution to suffer an injury.  *Babbitt v. United Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979); *Minn. Citizens Concerned for Life v. FEC*, 113 F.3d 129, 131 (8th Cir. 1997).  Plaintiffs may suffer an Article III injury, "if their First Amendment rights are objectively reasonably chilled" or when they "must either make significant changes to obey the regulation, or risk a criminal enforcement action by disobeying the regulation."  *Duhe v. City of Little Rock*, 902 F.3d 858, 866 (8th Cir. 2018); *Zanders*, 573 F.3d at 594.

Here, Salvatore faced an objective threat of criminal prosecution.  Police officers routinely approached him while he campaigned and told him he was violating an ordinance, and they referred him to the prosecutor for prosecution.  A reasonable person would objectively fear

15

criminal prosecution when repeatedly visited by law enforcement each time he took certain

actions.  The Court finds Salvatore has sufficiently established he suffered a constitutional

injury.  *See Miller v. City of St. Paul*, 823 F.3d 503, 506 (8th Cir. 2016) ("A party may allege an

injury in fact by showing that its First Amendment rights have been chilled by harm to reputation

or threat of criminal prosecution.").

Second, Defendants argue Salvatore's request for injunctive relief is now moot because

the Wildwood City Council repealed Section 415.440(F), the public-right-of-way ordinance.

"When a law has been amended or repealed, actions seeking declaratory or injunctive relief for

earlier versions are generally moot unless the problems are 'capable of repetition yet evad[ing]

review.'"  *Phelps-Roper v. City of Manchester, Mo.*, 697 F.3d 678, 687 (8th Cir. 2012) (quoting

*McCarthy v. Ozark Sch. Dist.*, 359 F.3d 1029, 1035 (8th Cir. 2004)).  But, here, unlike in *Phelps-*

*Roper*, Salvatore's request for injunctive relief does not seek to enjoin enforcement of the

ordinance.  Doc. 1.  Instead, Salvatore seeks to enjoin Defendants from violating the First

Amendment, regulating political speech based on its content, providing resources to certain

candidates but not others, using any ordinance to ban expressions of free speech on public or

private property when reasonable as to time, place, and manner, and using law enforcement to

interfere in political campaigns.  *Id*.  Because Salvatore does not seek to enjoin enforcement of

this specific ordinance, Wildwood's repealing the ordinance does not make Salvatore's request

for injunctive relief moot.

However, Salvatore also challenges the ordinance as facially overbroad.  Wildwood's

repealing of the ordinance makes his overbreadth challenge moot.  *See Stephenson v. Davenport*

*Cmty. Sch. Dist.*, 110 F.3d 1303, 1312 (Finding an overbreadth challenge was moot where the

regulation had been amended).  Therefore, the Court does not address overbreadth and turns to the constitutionality of the ordinance as applied to Salvatore.

### ii.       Nature of the Forum

The first step in determining whether a violation of the First Amendment has occurred is deciding if the First Amendment actually protects the speech at issue.  Neither party disputes that the speech at issue, political campaign speech, is protected; thus, the Court can move to the next step – identifying the nature of the forum.  *Cornelius v. NAACP Legal Defense & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985).  "[T]he extent to which the government may limit access depends on whether the forum is public or nonpublic."  *Id*.  "In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed."  *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).  Streets, sidewalks, and parks are traditional public fora.  *Id*.; *see also Ball v. City of Lincoln, Neb.*, 870 F.3d 722, 730 (8th Cir. 2017) ("The quintessential examples of such traditional public fora are streets, sidewalks, and public parks.").  In traditional public fora, "the government may not prohibit all communicative activity."  *Perry Educ. Ass'n*, 460 U.S. at 45.  Here, the parties agree the places at issue are traditional public fora – streets and sidewalks; thus, Wildwood's right to limit expressive activity in these fora is limited.

### iii.      Content-Neutral v. Content-Based

Next, the Court must determine whether the ordinance is content-neutral or content-based to determine the level of scrutiny it should apply to the ordinance.  *Phelps-Roper*, 697 F.3d at 687.  "[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."  *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984).  A court must consider whether "a regulation

of speech on its face draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* "Government regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989).

To enforce a content-based exclusion, the government must show "that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end." *Perry Educ. Ass'n*, 460 U.S. at 45. The government may enforce time, place, and manner restrictions that are content-neutral if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *Id.*

The ordinance at issue in this case is content-neutral on its face. It applies to all signs, no matter the content of the signs. However, Salvatore asserts Defendants applied the ordinance to him in a content-based manner. He argues Defendants allow other signs on public property or in the public right-of-way and only applied the ordinance against campaign signs. He cites to an annual Right to Life march held in Wildwood and unions picketing against the use of non-union labor. However, he provides no facts that individuals in the Right to Life march or union picketers hold signs. While the Court finds it probable that both of these events included signs, Salvatore introduced no evidence to establish that Defendants allowed signs in those instances. The facts currently before the Court do not suggest that Defendants applied the ordinance only to campaign signs and not to other signs.

However, a genuine issue of material fact exists as to whether Defendants applied the ordinance in a manner based on the content of Salvatore's signs in particular – that *his* signs

supported *his* election to city council.  Facts in the record show that Wildwood officials asked

multiple candidates to remove signs from the public right-of-way.  But other facts show that

Defendants never asked police to enforce the ordinance against any candidate besides Salvatore.

Salvatore testified that he felt targeted by Defendants and while various Defendants testified that

they were not focused on Salvatore alone, the parties dispute the facts relevant to whether

Defendants applied the ordinance against Salvatore in a content-based manner; the determination

of those facts relies heavily on the credibility of witnesses, which is for the jury to decide.  *See*

*United States v. Kessler*, 321 F.3d 699, 702 (8th Cir. 2003).  Unlike in *Taxpayers for Vincent*,

where there was "not even a hint of bias or censorship in the City's enactment or enforcement of

[the] ordinance," here, various fact support Salvatore's contention that Defendants applied the

ordinance to him based on the content of his signs.  466 U.S. at 804.

　　　If the facts at trial show that Defendants applied the ordinance to Salvatore in a content-

neutral manner, then Defendants must show it is narrowly tailored to serve a significant

governmental interest and leaves open alternative channels of communication.  *Excalibur Group,*

*Inc. v. City of Minneapolis*, 116 F.3d 1216, 1220 (8th Cir. 1997).  On the other hand, if the facts

at trial show that Defendants applied the ordinance to Salvatore in a content-based manner, then

Defendants must show "that its regulation is necessary to serve a compelling state interest and

that it is narrowly drawn to achieve that end."  *Perry Educ. Ass'n*, 460 U.S. at 45.

### iv.　　Governmental Interest

　　　Wildwood claims the ordinance serves the significant governmental interests of aesthetics

and safety, pointing to the preamble to the relevant ordinances.  The preamble states that the

purpose is "to promote the health, safety, morals, comfort, and general welfare; to secure

economic and coordinated land use; to facilitate the adequate provision of public improvements;

to protect the natural environment of the community and its unique assets of tress, watercourses and floodplains and topography; and to prevent or minimize damage to public and private property from erosion and other detrimental effects of development."  Wildwood Code § 415.020.  Further, Defendants submitted evidence that Wildwood has many rural, two-lane roads, with no shoulders or sidewalks.

For intermediate scrutiny, applied when an ordinance is content-neutral, courts have recognized both aesthetics and safety as significant governmental interests that municipalities have the power to regulate.  *Taxpayers for Vincent*, 466 U.S. at 805 ("It is well settled that the state may legitimately exercise its police powers to advance esthetic values."); *see also Stahl v. City of St. Louis, Mo.*, 687 F.3d 1038, 1040 (8th Cir. 2012) ("The ordinance here concerns road safety, an area in which municipalities traditionally have power to regulate."); *Johnson v. City & Cty. of Phila.*, 665 F.3d 486, 491 (3d Cir. 2011) ("[I]t is clear from Supreme Court precedent that the goals of traffic safety and the appearance of the city are substantial governmental goals.") (internal quotations and citations omitted).  However, for strict scrutiny, applied when an ordinance is content-based, aesthetics and traffic safety do not constitute compelling interests. *Willson v. City of Bel-Nor, Mo.*, 924 F.3d 995, 1001 (8th Cir. 2019).  Whether or not Wildwood's proffered interests are adequate justifications for the ordinance under intermediate or strict scrutiny, the record is not sufficiently developed for the Court to determine the next step, whether the ordinance is narrowly tailored to further Wildwood's interests.

### v.   Narrowly Tailored

"[T]o be narrowly tailored, [a regulation] must not burden substantially more speech than is necessary to further the government's legitimate interests."  *McCullen v. Coakley*, 573 U.S. 464, 486 (2014).  The regulation "need not be the least restrictive or least intrusive means of

serving the government's interests," but the government "may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id*. (internal quotations and citations omitted).  "The danger the regulation protects against must be real, not speculative," but once the government has established that, "the government's choice among the means to accomplish its end is entitled to deference."  *Ass'n of Cmty. Orgs. For Reform Now v. St. Louis Cty.*, 930 F.2d 591, 595 (8th Cir. 1991).

In *Traditionalist American Knights of the Ku Klux Klan v. City of Desloge, Missouri*, the Ku Klux Klan challenged an ordinance prohibiting solicitation or distribution in Desloge's roadways.  775 F.3d 969, 971 (8th Cir. 2014).  The key issue on appeal was whether the ordinance was narrowly tailored to serve Desloge's interests in pedestrian and traffic safety.  *Id*. at 975.  Before the district court, Desloge introduced testimony from the City Administrator about why Desloge enacted the ordinance and a traffic consultant who, prior to Desloge's enacting the ordinance, prepared a report identifying and evaluating safety issues raised by pedestrian distributions or solicitations on public roadways.  *Id*. at 973-74.  The Eighth Circuit found that Desloge introduced sufficient evidence showing it enacted the ordinance to address identified traffic safety concerns, and that ultimately, the ordinance was narrowly tailored to serve those asserted interests.  *Id*. at 976.

Contrast that case with *Johnson v. Minneapolis Park and Recreation Board*, in which the plaintiff challenged a local regulation that restricted literature distribution in a public park during a festival.  729 F.3d 1094, 1096 (8th Cir. 2013).  The park board stated that its interests in enacting the regulation were to maintain the orderly flow of people, provide access for security and emergency vehicles, and facilitate the activities of the participants of the festival.  *Id*. at 1099.  The board introduced an affidavit from the director of the festival who described a past

incident where distribution of literature caused a congregation of people.  *Id*.  The board also cited to past attendance statistics and predicted attendance figures for the upcoming year.  *Id*. at 1100.  The Eighth Circuit found that board did not make a satisfactory showing that the regulation was narrowly tailored to serve the board's interests because it "presented little evidence that forbidding literature distribution furthers a significant governmental interest at the Festival."  *Id*.

Here, Defendants produced only the preamble to Wildwood's zoning ordinances and the fact that Wildwood has many rural two-lane roads, with no shoulders or sidewalks.  Defendants produced nothing to connect these interests and the ordinance.  "It is not enough for the Government to recite an interest that is significant in the abstract; there must be a genuine nexus between the regulation and the interest it seeks to serve."  *Willson*, 924 F.3d at 1002 (quoting *Johnson*, 729 F.3d at 1099) (cleaned up).  In *Willson*, another case about a sign ordinance, the city introduced testimony of its mayor that the city had many schools, small housing lots, and narrow streets and that the city was concerned about distracted driving.  *Id*.  The Eighth Circuit held that was not enough, and that the city had not proved the required nexus.  *Id*.  Similarly, Defendants here have not proved the required nexus and the record is not sufficiently developed to determine whether the ordinance is narrowly tailored to Defendants' stated interests.  The Court therefore cannot determine whether the ordinance survives intermediate or strict scrutiny.

Salvatore raises a serious challenge to the constitutionality of the ordinance as applied to him.  The Court cannot conclusively determine the constitutionality of the ordinance on the present record because genuine disputes of material fact exist as to how the ordinance was applied to Salvatore and others, and Wildwood failed to sufficiently develop the record as to its

claimed need to enact the ordinance.  Therefore, the Court denies both Salvatore and Defendants'
Motions for Summary Judgment.

### B.       Claims against the Individual Defendants

Salvatore asserts two claims against the individual defendants.  He asserts that they
violated 42 U.S.C. § 1983 by denying him his rights under the First Amendment, and he asserts a
claim for civil conspiracy.

#### i.       Violation of § 1983

To establish personal liability in a § 1983 action, Salvatore must show that Defendants
"acting under color of state law, caused the deprivation of a federal right."  *Clay v. Conlee*, 815
F.2d 1164, 1170 (8th Cir. 1987).  Defendants argue Salvatore has no evidence that the individual
Defendants were present or participated in the law enforcement interactions that Salvatore claims
violated his rights.

An individual may not be held liable under § 1983 under a theory of vicarious liability or
*respondeat superior.  Tlamka v. Serrell*, 244 F.3d 628, 635 (8th Cir. 2011).  To be liable, an
individual must directly participate in the alleged constitutional violation.  *Id*.  Salvatore has
introduced enough evidence to create a genuine issue of material fact as to whether the
individual Defendants directly participated in deprivation of Salvatore's First Amendment rights.
The facts show that Bowlin as the head of the elected government, wields the power to veto the
contract Wildwood has with the St. Louis County police.  Bowlin, Manton, and Thomas
communicated regularly and sent proximate-in-time text messages on days that Salvatore had
interactions with police.  Manton complained to several Wildwood officials about Salvatore's
activities including to Thomas, who then took action — knowing the police would investigate, he

23

contacted them several times about Salvatore's campaign activities.  At one point, Bowlin contacted the mayor of a neighboring city to discuss Salvatore.

While Bowlin testified that he never communicated with law enforcement about Salvatore, the jury must decide his credibility.  So too with Thomas.  Whether the Court will grant an adverse instruction against Defendants for spoliation of evidence remains at issue, and would impact the jury's credibility assessments.  In short, the Court finds that genuine issues of material fact exist on Bowlin and Thomas's direct participation in deprivation of Salvatore's First Amendment rights, and denies both Motions for Summary Judgment on this point.

### ii.    Civil Conspiracy Claim

In addition to his First Amendment claim, Salvatore alleges that the individual Defendants engaged in a civil conspiracy to deprive Salvatore's First Amendment rights.  To establish a claim for civil conspiracy, Salvatore must prove a "defendant conspired with others to deprive him [] of a constitutional right; that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and that the overt act injured [Salvatore]."  *Askew v. Millerd*, 191 F.3d 953, 957 (8th Cir. 1999).  Salvatore must also show "a deprivation of a constitutional right or privilege in order to prevail."  *Id*.

Defendants argue that Salvatore has not shown specific, material facts that Bowlin and Thomas reached an agreement to deprive Salvatore of his constitutional rights.  "To advance past the summary judgment stage, [Salvatore] must allege with particularity and specifically demonstrate material facts that the defendants reached an agreement."  *See Reasonover v. St. Louis Cty., Mo.*, 447 F.3d 569, 582 (8th Cir. 2006).  Each defendant need not know the exact agreement, but Salvatore must show "evidence sufficient to support the conclusion that the defendants reached an agreement to deprive [him] of constitutionally guaranteed rights."  *White*

*v. McKinley*, 519 F.3d 806, 816 (8th Cir. 2008).  "The question of the existence of a conspiracy to deprive [Salvatore] of [his] constitutional rights should not be taken from the jury if there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims."  *Id.* (quoting *Larson by Larson v. Miller*, 76 F.3d 1446, 1458 (8th Cir. 1996)).

Here, the jury could infer an understanding among these individuals to deprive Salvatore of his First Amendment rights from the communications between Manton, Thomas, Vujnich, Bowlin, other Wildwood officials, and Captain Tanner throughout the campaign, coupled with the missing text messages and that Salvatore was Manton's opponent.  Defendants' actions throughout Salvatore's campaign create suspicion as to the intent of their actions and their coordination.  This evidence creates a reasonable inference of a conspiracy such that it should go to a jury.

Defendants also argue that the "intracorporate conspiracy doctrine" defeats Salvatore's conspiracy claim.  This doctrine provides that "a local government entity cannot conspire with itself through its agents acting within the scope of their employment."  *Kelly v. City of Omaha, Neb.*, 813 F.3d 1070, 1078 (8th Cir. 2016).  The Eighth Circuit has not addressed whether the doctrine applies to § 1983 conspiracy claims.  *Burbridge v. City of St. Louis, Mo.*, 430 F. Supp. 3d 595, 622 (E.D. Mo. 2019), *appeal docketed* No. 20-1029 (8th Cir. Jan. 06, 2020).  The Court declines to extend the doctrine beyond established precedent.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Joint Motion for Summary Judgment [47] is **DENIED**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Summary Judgment on All Issues Except Damages [50] is **DENIED**.

**IT IS FURTHER ORDERED** that this matter is set for trial on **November 9, 2020**.  The Court will hold a pretrial conference on **November 3, 2020, at 9:00 a.m.**

So Ordered this 4th day of August, 2020.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

26